IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LARRY TAYLOR, ET AL.                                           PLAINTIFFS

v.                                    CIVIL ACTION NO. 3:12-CV-506-CWR-LRA

DETROIT DIESEL REALTY, INC.          DEFENDANT/THIRD-PARTY PLAINTIFF

v.

CLARKE POWER SERVICES, INC.                    THIRD-PARTY DEFENDANT

<u>ORDER</u>

Before the Court are several motions for summary judgment.  Docket Nos. 76, 79, 81.

Having reviewed the parties' submissions and relevant law, and after holding a hearing on the

motions on January 21, 2014, the Court is now ready to rule.

## I. FACTUAL AND PROCEDURAL HISTORY

In 1978, Larry Taylor and Harrell Jeanes, Sr. ("Jeanes") — the deceased father of

Plaintiffs William Jeanes and Harrell Jeanes, Jr. — built two metal buildings on approximately

5.28 acres of land on Highway 49 in Richland, Rankin County, Mississippi.  The buildings were

to be used for heavy engine repair and parts sales.  The parties dispute whether Taylor and Jeanes

jointly owned the property as individuals, or whether a partnership formed by Taylor and Jeanes

owned it.  Nevertheless, Taylor and Jeanes operated their heavy engine repair and parts sales

business at the Highway 49 property for about ten years beginning in 1978.

On August 29, 1989, Taylor and Jeanes executed an agreement whereby they leased the

land and buildings (hereinafter referred to collectively as "the Premises") to Detroit Diesel

Realty, Inc. ("DDR"), a Michigan corporation.  Docket No. 79-1.  The term of the lease was 15

years, with an end date of August 31, 2004, unless the parties were to agree otherwise.  After

August 2004, the lease was continued on a month-to-month basis until February 2012.  The

monthly rent was $10,000 for the first 5 years of the lease period, $15,000 for the next 5 years,

and $17,000 thereafter.  The lease includes the following provisions:

> 5. <u>Maintenance and Repair</u>.  Tenant shall keep and maintain the Premises in as clean, sanitary and safe a condition and in as good order and condition as when delivered to it.  Tenant shall use the Premises in a fashion consistent with Owner's prior use.
>
> In the event Tenant fails to make or initiate any repair which it is required to make hereunder within 45 days after notice from Owner specifying the nature of the repair to be made, then the Owner may make such repair without prejudice to any other right or remedy it may have because of the Tenant's default.  If Owner is required to make a repair supposed to be made by Tenant, the cost thereof will be due within ten (10) days after receipt of written notice thereof by Tenant.
>
> . . .
>
> 8. <u>Accidents, Indemnity and Public Liability Insurance</u>. Owner shall not be liable for any damage to person or property sustained by Tenant or others caused by any non-repair of the Premises required of Tenant hereunder.  Before entering on the Premises, Tenant shall procure and maintain public liability insurance insuring against claims for bodily injury, death or property damage occurring on, in or about the Premises in the amount of not less than TWO MILLION DOLLARS ($2,000,000.00) for injury to or death of one person, and in the amount of not less than FOUR MILLION ($4,000,000.00) for injury to or death of two or more persons, and in one occurrence, and for damage to property in the amount not less than ONE MILLION DOLLARS ($1,000,000.00). . . .  Such policies shall name Owner, Tenant and all mortgagees as insureds, and shall, to the extent obtainable, contain an agreement by the insurer that such policies shall not be canceled or substantially modified without at least 30 days' prior notice to Owner.
>
> Tenant will indemnify and hold owner harmless from and against all losses, costs, damages, expenses and liability, including but not limited to reasonable attorney fees, which owner may incur or pay out by reason of (a) any injury to persons or property occurring in, on or about the Premises, even though such might have been caused or contributed to by the negligence of Owner; (b) any breach or default hereunder on Tenant's part; (c) any work done in or to the Premises; (d) any maintenance or repair work performed by or required to be performed by Tenant hereunder; or (e) any act or negligence on the part of Tenant; provided, however, to the extent of the proceeds received by Owner under any insurance furnished by Tenant, Tenant's obligation to indemnify and hold harmless Owner

against the claim covered by such insurance shall be deemed to be satisfied to such extent.

. . .

10.  <u>Assignment and Subletting</u>.  Tenant may assign or sublet this Lease or any interest therein or to the Premises or any part thereof . . . .  Notwithstanding the assignment or subletting of the Premises, Tenant shall not be released from liability hereunder whether or not the Owner is required to consent to such assignment or subletting.

. . .

23.  <u>Surrender of Possession</u>.  Upon expiration of the term of this Lease, if Tenant has elected not to acquire the Premises, Tenant shall promptly and peaceably surrender the Premises in good condition and repair except for:  (i) ordinary wear and tear, and (ii) damage resulting from causes not insured against because of Owner's failure to insure the Premises as required hereunder, acts of God, or alterations or additions agreed to by Owner.

Docket No. 79-1, at 2, 3, 6.

DDR occupied the Premises from August 1989 through 1995.  On January 1, 1996, pursuant to Paragraph 10 of the lease, DDR and Clarke Power Services, Inc. ("Clarke") executed a sublease that allowed Clarke to sublease the Premises from DDR under terms that were similar, although not identical, to those included in the Taylor/Jeanes-DDR lease.

In 2004, Plaintiffs expressed to DDR their concern about the condition of the property, and they requested that DDR make certain repairs.  In 2010, Plaintiffs hired Peoples Construction Corporation to estimate the cost of needed repairs, and they demanded that DDR pay for such repairs.  DDR did not comply.  The next year, on November 22, 2011, DDR gave Clarke notice that it was terminating the lease with Plaintiffs, and thereby terminating the sublease, effective February 22, 2012.

On July 18, 2012, Plaintiffs filed a Complaint against DDR, alleging that DDR had

"breached the lease by failing to maintain the property as provided in the lease with the result that the leased property ha[d] deteriorated substantially and [was] unrentable."  Docket No. 1, at 4.  Plaintiffs further allege that DDR was obligated under the lease "to indemnify and hold owner harmless from all losses, costs, damages, expenses, liability, and attorney fees" for certain enumerated circumstances, Docket No. 1, at 3, and that DDR's actions amount to gross negligence that supports a claim for tortious breach of the lease agreement, *id.* at 4.  Plaintiffs, therefore, argue that DDR is liable to Plaintiffs for the cost to perform repairs to the property, which was estimated to be $1,198,387 in 2010, for six months' lost rent at $17,000 per month for the breach of the lease, and for punitive damages arising from tortious breach of the lease agreement.  *Id.* at 4-5.  In total, Plaintiffs allege damages of $1,402,000, plus punitive damages and attorneys' fees and costs.  *Id.* at 5.

Based on the terms of the lease, DDR denies that it is liable to Plaintiffs.  However, on August 16, 2012, DDR filed a third-party complaint against Clarke, asserting that to the extent DDR is found liable to Plaintiffs for any damage to the property, DDR is entitled to recover from Clarke for Clarke's breach of "its obligations under the sublease with Detroit Diesel by failing to keep the premises in a clean, sanitary and safe condition, and in good order and repair, and to otherwise maintain the property as provided in the sublease."  Docket No. 7, at 3.

Plaintiffs, DDR, and Clarke have each moved for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence supporting its resolution in favor of the

party opposing summary judgment, together with any inferences in such party's favor that the evidence allows, would be sufficient to support a verdict in favor of that party," *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987) (citation omitted), and a fact is material if it is one that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party seeking to avoid summary judgment must identify admissible evidence in the record that shows a factual dispute.  Fed. R. Civ. P. 56(c)(1).  When evaluating a motion for summary judgment, a court must refrain from making credibility determinations or weighing the evidence.  *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001).

### III. DISCUSSION

The parties agree that Mississippi law applies to the interpretation of the lease and sublease that give rise to this diversity action.  *See Exxon Corp. v. Crosby-Mississippi Res., Ltd.*, 154 F.3d 202, 205 (5th Cir. 1998).  The lease and sublease will each be analyzed separately under Mississippi law.

**A. Taylor/Jeanes-DDR Lease**

Plaintiffs allege that "DDR has breached the terms of the lease as a matter of law by failing to maintain, repair, and return the leased premises to Plaintiffs in as good a condition as when it was leased, except for ordinary wear and tear as the lease required."  Docket No. 86, at 2.  Plaintiffs assert that there is no genuine dispute of material fact as to the cost of repairs to the property that were caused by DDR's breach of the lease, and that, therefore, they are entitled to summary judgment.  *Id.*  The three lease provisions on which the Plaintiffs rely are as follows: (1) "Maintenance and Repair," Docket No. 79-1, at 2; (2) "Surrender of Possession," *id.* at 6; and

(3) "Accidents, Indemnity and Public Liability Insurance," *id.* at 3.

DDR argues that it is entitled to summary judgment because, according to DDR, Plaintiffs do not own the Premises and have no standing to enforce the lease.  Further, DDR contends that the statute of limitations has expired on Plaintiffs' claims arising out of any alleged breach of DDR's duties to repair and maintain the Premises.  DDR also asserts that based on the terms of the contract, DDR is not responsible for the damages claimed by Plaintiffs because the damages relate to repairs that are beyond the scope of DDR's repair obligations, and because Plaintiffs misconstrue the meaning of the indemnity clause.  Finally, DDR contends that Plaintiffs' claims for tortious breach of contract and punitive damages fail as a matter of law.

During the hearing held on the parties' motions for summary judgment, Plaintiffs conceded that their claims for tortious breach of contract and punitive damages are not supported by the evidence.  Therefore, summary judgment shall be granted in favor of DDR as to those claims.  Each of the Plaintiffs' and DDR's remaining arguments will be addressed, starting with the threshold issues of standing and the statute of limitations.

1. Standing

Under Article III of the United States Constitution, federal courts may adjudicate only actual "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  "The irreducible constitutional minimum of standing contains three elements: injury-in-fact, causal connection, and redressability."  *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 635 (5th Cir. 2012) (quotation marks and citations omitted).  To establish standing "[i]n a suit based upon contractual theory[,] . . . privity of contract must have been shown."  *Barrett Computer Servs., Inc. v. PDA, Inc.*, 884 F.2d 214, 216 (5th Cir. 1989) (footnote and citations omitted).  DDR

argues that Plaintiffs do not have standing to sustain their claims against DDR because although Jeanes and Taylor signed the lease that is the subject of this suit, a partnership formed by Jeanes and Taylor, not Jeanes and Taylor as individuals, owned the Premises at the time it was leased to DDR.

In support of its argument, DDR relies on the deposition testimony of Taylor, William Jeanes, and Harrell Jeanes, Jr.  Taylor testified that the Taylor and Jeanes partnership owns the Premises, and that the partnership was formed in about 1976, with Jeanes owning 50% of the partnership and Taylor Machinery Corporation, a Mississippi corporation of which Taylor is the president, owning 50%.  According to Taylor, the partnership now consists of William Jeanes and Harrell Jeanes, Jr.—who inherited Jeanes' share of the partnership after Jeanes and his wife died—and Taylor Machinery Corporation.

When asked whether a construction company named Taylor and Jeanes built the Premises, Harrell Jeanes, Jr. testified that "[w]e just ran our own project," but if there was a company name, "it would have had to be the Taylor and Jeanes partnership."  Docket No. 76-2, at 2-3.  William Jeanes also testified that a partnership named Taylor and Jeanes owns the Premises.  Harrell Jeanes, Jr. testified that the partnership is neither an LLC nor an LLP, and William Jeanes said that he does not know how the partnership was set up.  Taylor testified that no papers were filed to form the partnership.

In response to DDR's motion for summary judgment, Plaintiffs acknowledge that their deposition testimony may have been "confusing when taken out of context," but they insist that they as individuals, not a partnership, own the Premises.  Docket No. 105, at 3-5.  They submitted a joint affidavit to support their contention:

> No partnership has owned any interest in the leased premises since it was
> purchased by Larry L. Taylor and Harrell F. Jeanes, Sr. in the 1970s as
> individuals.  Larry L. Taylor and Harrell F. Jeanes, Sr. rented the entire 20 acres
> on which the leased premises is located to Taylor &[ ]Jeanes, Inc. until DDR
> leased it on August 29, 1969.  As shown in Addendum 1 to that lease, Mississippi
> Valley Title Insurance Company report No. 1362-R dated August 25, 1989
> showed that Larry L. Taylor and Harrell F. Jeanes, Sr. were owners of the leased
> premises . . . .
> . . .  No partnerships are involved in ownership of the leased premises.

Docket No. 105-1, at 1-2.

While a party typically cannot demonstrate a genuine dispute of fact by contradicting his

own previous sworn statement, *Holtzclaw v. DSC Communications Corp.*, 255 F.3d 254, 259

(5th Cir. 2001) (citation omitted), Plaintiffs have presented other evidence to establish a dispute

of fact.  They point out that the first sentence of the lease states that "THIS LEASE . . . is

between LARRY L. TAYLOR and HARRELL F. JEANES, (hereinafter called 'Owner') . . . ."

Docket No. 79-1, at 1.  In that sentence, the phrase "Mississippi partnership" was crossed out

after Taylor's and Jeanes' names.  *Id.* at 1.  Further, the lease includes the signatures of Taylor

and Jeanes with no mention of a partnership under the signature line.  *Id.* at 9.  Addendum 1 to

the lease also refers to Taylor and Jeanes as "Owner" of the Premises.  *Id.* at 12.

Plaintiffs' evidence is sufficient to present a genuine dispute of fact regarding whether a

partnership or Plaintiffs as individuals own the Premises.  Therefore, summary judgment based

on the standing issue is inappropriate.  *See Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178

F.3d 350, 357 (5th Cir. 1999) ("When the defendant moves for summary judgment because of

lack of standing, . . . the plaintiff must submit affidavits and comparable evidence that indicate

that a genuine issue of fact exists on the standing issue.") (quotation marks and citation omitted);

*United States v. One Parcel of Real Property Located at Route 2, Box 293, Lena, Miss.*, 46 F.

8

Supp. 2d 572, 581 (S.D. Miss. 1998) ("[S]ince whether [plaintiff] has the requisite standing . . . is a disputed question, this court cannot grant summary judgment . . . on this point.").

2. Statute of Limitations

Under Mississippi law, a breach of contract action "shall be commenced within three (3) years next after the cause of such action accrued, and not after."  Miss. Code Ann. § 15-1-49; *see CitiFinancial Mortg. Co. v. Washington*, 967 So. 2d 16, 19 (Miss. 2007).  "In a contractual claim, a cause of action accrues on the date of actual injury, the date the facts occurred which enable the Plaintiffs to bring a cause of action."  *Id.* (citation omitted).

Citing *Avelez Hotel Corp. v. Milner Hotels, Inc.*, 87 So. 2d 63, 65-67 (Miss. 1956), DDR argues that a claim for breach of a general covenant to repair accrues as soon as repairable damage occurs, and that any damage that was done to the Premises more than three years prior to Plaintiffs filing their action on July 18, 2012, is barred by the statute of limitations.  DDR points to an email from William Jeanes dated January 14, 2004, to suggest that the damages at issue in this suit took place more than eight years before the lawsuit's filing.  Docket No. 76-11, at 1. The William Jeanes email includes a draft of a letter to Detroit Diesel Corporation's general counsel that states the following:

> A number of the buildings have been allowed to deteriorate well beyond what can be considered normal wear and tear, and an EPA clearance will be necessary.
>
> Would you like to send a representative to inspect the buildings and discuss their prompt repair (in order that we may re-lease by August of this year), or would you like us to send an invoice-with supporting papers and photographs-for the estimated repairs?
>
> Because the work needed to restore the buildings to rentable condition will require considerable time, we hope that you will respond to this letter with somewhat more speed than has been the case in the past.

9

*Id.*

As Plaintiffs have argued, DDR's basis for arguing that Plaintiffs' claims are barred by the statute of limitations is inapplicable to Plaintiffs' claims that arise out of the surrender of possession provision of the lease, which requires that DDR surrender the Premises "in good condition and repair except for . . . ordinary wear and tear . . . ."[1]  Docket No. 79-1, at 6.  DDR's duty to surrender the Premises in good condition and repair did not arise until the conclusion of the lease, which was in February 2012.  *See Avelez Hotel Corp.*, 87 So. 2d at 66 ("[O]n a covenant to leave the premises in as good condition as he found them, no action will lie against the lessee until the end of the term, for obvious reasons.") (quoting *City Hotel Co. v. Aumont Hotel Co.*, 107 S.W.2d 1094, 1095 (Tex. Civ. App. 1937)).  Therefore, Plaintiffs' July 2012 Complaint was timely filed with regard to claims relating to the surrender of possession clause.

Further, the Mississippi Supreme Court's ruling in *Avelez Hotel Corp. v. Milner Hotels, Inc.*, supports Plaintiffs' assertion that DDR's duty to maintain and repair the Premises as required by the maintenance and repair clause was an ongoing duty that continued throughout the lease period and did not simply vanish as of the date Plaintiffs recognized the need for repairs. *See* 87 So. 2d at 65-67.  In *Avelez*, the plaintiff, the owner of property that was being leased, filed suit against the tenant during the term of the lease for breach of the maintenance and repair provision of the lease.  *See id.* at 63-67.  Although the tenant argued that the plaintiff's action against it was premature, the Mississippi Supreme Court held that "where a lessee covenants to

---

[1] Although DDR asserts that the maintenance and repair clause should be read in conjunction with the surrender of possession clause, Docket No. 77, at 16, DDR argues that Plaintiffs' lawsuit does not include a claim for breach of the surrender of possession provision of the lease because that provision was not referred to in the Complaint.  Docket No. 112, at 12.  However, the entire lease has been made part of the record, and Plaintiffs' argument that DDR breached the covenant to surrender in good condition is consistent with the Complaint's allegations that DDR "breached the lease by failing to maintain the property" and left the Premises "in a deplorable

keep the premises in repair during the term, and at the expiration thereof to surrender them in like condition, and he omits to make the necessary repairs, the landlord's right of action accrues forthwith and *he need not wait until the end of the term*." *Id.* at 65 (emphasis added).

Although *Avelez*'s holding pertains to ripeness and does not directly address the issue of statute of limitation, importantly, the court did not hold that the landlord *must* bring an action for breach of the covenant to maintain and repair prior to the termination of the lease. Rather, the court's choice of words suggests that although a landlord *may* immediately bring an action against a tenant for breach of the covenant to maintain and repair, he is not required to do so. *See id.* at 66 (quoting *City Hotel Co.*, 107 S.W.2d at 1095) ("The established rule seems to be that when a tenant under this character of contract breaches the obligation to keep the leased premises in a proper state of repair, the landlord may bring suit for resulting damages when the injury occurs, without waiting until the lease terminates."). He may instead wait until the lease has been terminated to do so considering the ongoing nature of a tenant's duty to repair and maintain the premises during the lease period. *See, e.g.*, *In re Cohoes Indus. Terminal, Inc.*, 78 B.R. 681, 704-05 (Bankr. S.D.N.Y. 1987) (holding that landlord's action for breach of debtor's covenant to keep leased premises in repair throughout the term of the lease could be brought within six years [the applicable New York statute of limitations] after the expiration of the term, and characterizing the tenant's breach as "a continuing breach of a continuing covenant"); *James S. Black & Co. v. F.W. Woolworth Co.*, 544 P.2d 112, 118 (Wash. Ct. App. 1975) ("A lessor whose lease contains a covenant to repair may bring an action as soon as the premises become out of repair, but the lessor is not required to do so; he may wait until after the expiration of the

condition." Docket No. 1, at 4.  The Court, therefore, finds no reason that Plaintiffs should not be allowed to rely on the theory that DDR breached the lease by failing to surrender the Premises in good condition.

term of the lease.").  Therefore, DDR's assertion that Plaintiffs' claims are barred by the statute of limitations is without merit.

      3. The Lease Provisions

The parties dispute the meaning of several of the lease's provisions: (1) the "Maintenance and Repair" clause, (2) the "Surrender of the Premises" clause, and (3) the indemnity clause. Plaintiffs argue that, as a matter of law, DDR is liable for several categories of repairs under the terms of the lease: site/concrete work, restoring the main building front, installing new roofs, painting the exterior of the buildings, replacing exterior wall sheets, and restoring office areas. Plaintiffs rely on a 2010 estimate provided by Peoples Construction Corporation to support their contention that DDR is liable for more than $1,198,387 for its breach of the lease's provisions. *See* Docket No. 76-8.

DDR asserts that it did not have a duty to repair the damages at issue because they either resulted from "ordinary wear and tear" or because the repairs amount to "structural" or other "permanent" repairs that are outside the scope of its duties under the lease's provisions.  Docket No. 76, at 3; Docket No. 77, at 7-24.

Under Mississippi law, a court should use a three-tiered approach to interpret a lease. *Facilities, Inc. v. Rogers-Usry Chevrolet, Inc.*, 908 So. 2d 107, 111 (Miss. 2005) (citing *Royer Homes of Mississippi, Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 752 (Miss. 2003)).

> Legal purpose or intent should first be sought in an objective reading of the words employed in the contract to the exclusion of parol or extrinsic evidence. First, the "four corners" test is applied, wherein the reviewing court looks to the language that the parties used in expressing their agreement. We must look to the "four corners" of the contract whenever possible to determine how to interpret it. When construing a contract, we will read the contract as a whole, so as to give effect to all of its clauses. Our concern is not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the

best resource for ascertaining the intent and assigning meaning with fairness and accuracy. Thus, the courts are not at liberty to infer intent contrary to that emanating from the text at issue. On the other hand, if the contract is unclear or ambiguous, the court should attempt to harmonize the provisions in accord with the parties' apparent intent. Only if the contract is unclear or ambiguous can a court go beyond the text to determine the parties' true intent. The mere fact that the parties disagree about the meaning of a contract does not make the contract ambiguous as a matter of law.

. . . Secondly, if the court is unable to translate a clear understanding of the parties' intent, the court should apply the discretionary "canons" of contract construction. Where the language of an otherwise enforceable contract is subject to more than one fair reading, the reading applied will be the one most favorable to the non-drafting party. Finally, if the contract continues to evade clarity as to the parties' intent, the court should consider extrinsic or parol evidence. It is only when the review of a contract reaches this point that prior negotiation, agreements and conversations might be considered in determining the parties' intentions in the construction of the contract.

*Royer Homes*, 857 So. 2d at 752-53 (quotation marks and citations omitted). Neither the parties nor the Court deems the provisions of the lease to be ambiguous. The Court, therefore, looks only to the "four corners" of the lease to determine the meaning of its provisions.[2]

a. Maintenance and Repair and Surrender of Premises Clauses

The relevant part of the lease's maintenance and repair provision states, "Tenant shall keep and maintain the Premises in as clean, sanitary and safe a condition and in as good order and condition as when delivered to it." Docket No. 79-1, at 2. The surrender provision states, in part, that "Tenant shall promptly and peaceably surrender the Premises in good condition and repair except for: (i) ordinary wear and tear, and (ii) damage resulting from causes not insured against because of Owner's failure to insure the Premises as required hereunder, acts of God, or alterations or additions agreed to by Owner." *Id.* at 6. The lease defines "Premises" as "the real

---

[2] Although DDR and Clarke offer expert opinions regarding the meaning of the lease's provisions, the Court finds that the experts' opinions are unnecessary for the Court to interpret the unambiguous provisions of the lease that are at issue in this matter. Thus, the Court gives no regard to the experts' opinions on the parties' rights

estate which, together with the improvements located thereon, as more particularly described on . . . Exhibit A." Docket No. 79-1, at 1. "Exhibit A" to the lease states: "The land more specifically described [in the legal description of the property] and all buildings, structures and improvements thereon." *Id.* at 11.

Under Mississippi law, the requirements for DDR to maintain and repair the Premises during the term of the lease and to surrender the Premises at the conclusion of the lease in as good condition as received "constitute in fact two covenants: (1) a covenant to repair, and (2) a covenant to leave in repair at the end of the term." *Avelez Hotel Corp.*, 87 So. 2d at 65. "They are generally treated as independent covenants." *Id.* (citation omitted).

DDR argues that because the covenant to maintain and repair and the covenant to surrender in good condition must be read together, "the lessee would not be required, under the covenant to repair, to make repairs that exceeded its obligations with respect to the condition of the property upon surrendering it back to the lessor." Docket No. 77, at 16. Therefore, DDR asks the Court to conclude that "Detroit Diesel did not have a duty to fix 'ordinary wear and tear' damages." *Id.* at 18. In other words, DDR asserts that the "wear and tear" exception that is included in the surrender clause is also applicable to the maintenance and repair clause. Plaintiffs, however, insist that there is no exception to the maintenance and repair clause. Docket No. 105, at 12-15.

In *Avelez Hotel Corp.*, the Mississippi Supreme Court touched on the scope of a tenant's repair obligations under a covenant to repair. *See* 87 So. 2d at 65-67.

> Under the common law a tenant is required so to care for the leased premises as to prevent injury to the inheritance, in order that the estate may revert to the lessor undeteriorated by the willful or negligent conduct of the tenant. This rule

and duties under the lease.

> obligates the lessee merely to make such ordinary repairs as are necessary to prevent what would amount to waste.  For the lessee is impliedly obligated to use reasonable care to cause no unnecessary injury to the leased premises while using them for the purpose for which they were leased.  In determining the extent of the lessee's obligation under express covenants in relation to repairs, the courts will take into consideration his common-law liabilities.

*Id.* at 65 (citation omitted).

With regards to the relationship between a covenant to repair and a covenant to surrender in repair, the court stated, "A distinction is made between a covenant to repair and a covenant to surrender in repair.  The former differs from the latter in that it is more extensive in its application.  A covenant to make repairs from time to time is not satisfied by making repairs at any time before the premises are surrendered.  Repairs must be made when needed."  *Id.* (citation omitted).  The court also quotes with approval a New York case that states the following regarding the covenant to repair and the covenant to surrender in repair:

> Considering the two covenants together, it seems to me they required the lessee to make such repairs during the term as became necessary to keep the property in a condition so that it could be surrendered in compliance with the covenant as to its condition when surrendered at the expiration of the term.

*Id.* at 66 (quoting *Wanamaker v. Butler Mfg. Co.*, 120 N.Y.S. 1000, 1002 (1910)).  It is this language on which DDR relies in concluding that the covenant to maintain and repair is subject to the "wear and tear" exception that is included in the covenant to surrender in repair.  However, considering the two covenants together does not mean that the "wear and tear" exception in the surrender clause is implicitly included in the maintenance and repair clause.  Rather, that requirement merely acknowledges the basic rule of contract construction, which is that a contract should be construed as a whole, and effect should be given to each of the provisions.  *See Royer Homes*, 857 So. 2d at 752; *Wanamaker*, 120 N.Y.S. at 1002 ("The two covenants must be

considered together.  Both were in the lease, and should be regarded as put there for some purpose.").

Neither the lease nor any Mississippi case on which the parties have relied suggests that a lessee should consider whether damage to a property is the result of "ordinary wear and tear" to determine what maintenance and repair should take place under a covenant to maintain and repair such as the one in this case.   Under a covenant to repair, the tenant must make necessary repairs throughout the term of the lease.  *See* Docket No. 79-1, at 2; *Avelez Hotel Corp.*, 87 So. 2d at 65-67.  Under the lease at issue in this matter, the necessary repairs are those that are required to "keep and maintain the Premises in as clean, sanitary and safe a condition and in as good order and condition as when delivered" to DDR.  Docket No. 79-1, at 2.

"Ordinary wear and tear" has been defined in the context of a covenant to surrender in good repair as "any usual deterioration from the use of the premises in the lapse of time," the duration of the lease of the property.  *Waddell v. De Jet*, 23 So. 437, 438 (Miss. 1898).  This exception to the surrender clause, when considered in conjunction with a lessee's duty to maintain and repair, excuses a lessee for deterioration that takes place despite the lessee's fulfillment of its duty to perform maintenance and make repairs that are aimed at keeping the premises in the same condition as when the lessee began occupying the premises.

Consider, for example, a tenant who has a multi-year lease for a property that contains carpet flooring.  The lease contains a covenant to maintain and repair, as well as a covenant to surrender in good condition, ordinary wear and tear excepted.  Examples of wear and tear of the carpet might include the accumulation of dirt or visible indications of heavy traffic on the carpet over time.  In order to keep the carpet in good repair, a reasonable caretaker of the property

16

would vacuum the carpet regularly and occasionally shampoo it to slow down the rate of deterioration of the carpet.

Assume that the tenant does, in fact, vacuum and shampoo the carpet during the term of the lease.  Even doing so, the carpet will exhibit some wear and tear at the conclusion of the lease.  Given the "ordinary wear and tear" exception of the surrender clause, if the tenant properly maintained the carpet by vacuuming and shampooing it during the term of the lease, the tenant will not have violated either the maintenance and repair clause or the surrender clause as they relate to the carpet when the carpet is surrendered in a reasonably "worn" condition.  To use the language of *Avelez*, shampooing and vacuuming the carpet would be examples of maintenance that is "necessary to keep the property in a condition so that it could be surrendered in compliance with the covenant as to its condition when surrendered at the expiration of the term," and care that "prevent[s] what would amount to waste" and "prevent[s] injury to the inheritance, in order that the estate may revert to the lessor undeteriorated by the willful or negligent conduct of the tenant."  87 So. 2d at 65, 66.

The above example stands in stark contrast to a scenario in which the tenant never vacuums or shampoos the carpet and allows dirt and stains to remain on the carpet over a long period of time.  The failure to maintain the carpet by vacuuming and shampooing the carpet will lead to a faster rate of deterioration of the carpet, and the carpet will be in worse condition at surrender than if proper maintenance and repair had taken place.  Thus, when the property is surrendered, the tenant will have violated both the maintenance and repair and surrender clauses of the lease.

This interpretation of the covenant to repair is consistent with the Fifth Circuit's holding

17

in *Nadler v. American Motors Sales Corp.*, 764 F.2d 409, 411-16 (5th Cir. 1985), in which the

court interpreted the covenants of a long-term commercial lease agreement under Texas law.

The lease included a covenant that obligated the lessee to keep the premises "in good order and

condition" and to "make all necessary repairs," including "replacements or renewals," during the

lease term, and a covenant requiring the lessee to surrender the property at termination "in the

same condition as when received except for reasonable use and natural wear." [3] *Id.* at 411-12.

The case involved the deterioration of a heating, ventilation, and air conditioning ("HVAC")

system during the term of the lease.  The lessee argued that the surrender clause's "reasonable

use and natural wear" exception applied to the repair clause, and that the lessee was not

responsible for repairing the HVAC system as it wore out over time.  *Id.* at 414.  The Fifth

Circuit held that under Texas law of contract construction, which is consistent with that of

Mississippi,[4] and under the facts of the case, "the reasonable use and natural wear exception does

---

[3] The lease states as follows:

REPAIRS (9) Lessee covenants throughout the term of this Lease, at Lessee's sole cost and expense, to take good care of the demised premises, including the building and improvements now or at any time erected thereon, the equipment, fixtures, motors and machinery thereof, and the parking areas, fences and vaults, if any, and to keep the same in good order and condition, and shall promptly, at Lessee's own cost and expense, make all necessary repairs, interior and exterior, structural and non-structural, ordinary as well as extraordinary, foreseen as well as unforeseen. The term "repairs" shall include replacements or renewals when necessary, and such repairs shall be equal in quality and class to the original work. At the termination of this Lease, Lessee shall surrender the premises in the same condition as when received except for reasonable use and natural wear.

*Nadler*, 764 F.2d at 411-12.

[4] Consistent with Mississippi law, the Texas Supreme Court has described the process of contract interpretation as follows:

In the interpretation of contracts, whether they be ambiguous in the sense that that term is here defined or simply contain language of doubtful meaning, the primary concern of the courts is to ascertain and to give effect to the true intention of the parties. To achieve this object the courts will examine and consider the entire writing, seeking as best they can to harmonize and to give effect to all the provisions of the contract so that none will be rendered meaningless.

not excuse [the lessee] from repairing equipment that deteriorates from normal wear and tear during the lease term.  The exception, in other words, does not significantly modify the repair covenant."  *Id.*  The court determined that a dispute of fact existed regarding whether the tenant fulfilled its repair obligations and that summary judgment was, therefore, improper.  *See id.*  The court also provided guidance as to what the phrase "good order and condition" in the covenant to repair means:  "The phrase contemplates an objective standard by which to determine the necessity of repairs.  The passage may be rephrased as follows:  Lessee must repair or replace property that a reasonably prudent owner would repair or replace."  *Id.* at 416.

Similar to the covenant to repair in the *Nadler* lease, the covenant to maintain and repair in DDR's lease does not include an exception for ordinary wear and tear, and instead requires, without qualification, that DDR "keep and maintain the Premises . . . in as good order and condition as when delivered to it."  Docket No. 79-1, at 2; *see Nadler*, 764 F.2d at 415.  Thus, the wear and tear exception should not be incorporated into the maintenance and repair covenant.  *See Nadler*, 764 F.2d at 415; *Avelez Hotel Corp.*, 87 So. 2d at 65 (stating that the repair and surrender in repair covenants "are generally treated as independent covenants").  Further, although the maintenance and repair covenant in the present case does not include language requiring "replacements or renewals" as did the covenant in *Nadler*, the Fifth Circuit's guidance regarding the rule of thumb for determining what repairs are required under a covenant to repair is applicable to DDR's lease:  DDR should have "repair[ed] . . . property that a reasonably prudent owner would repair . . . ."  *Nadler*, 764 F.2d at 416.

---

*Nadler*, 764 F.2d at 414 (quoting *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 157-58 (Tex. 1951)).  To interpret the lease agreement in *Nadler*, the Fifth Circuit defined its task as "discovering the parties' intent through examination of the entire lease agreement and harmonization of each provision," *id.*, which is the precise task before the Court under Mississippi law.

DDR also requests that the Court adopt the following interpretations of the covenant to maintain and repair:

> *"Plaintiffs, not Detroit Diesel, had a duty to repair items damaged by 'the elements or any other cause[.]'"  Docket No. 77, at 18.*

Paragraph 17 of the lease states the following:

Damage to Improvements.  If the improvements on the Premises should be partially or totally destroyed, the following shall apply:

(a) In the event of a partial destruction of the Premises by fire, elements or any other cause, which renders the Premises or any part thereof untenantable, the rent due shall abate to the extent and for the period of such untenantability.  If the improvements become totally destroyed by virtue of such cause, as determined by Owner in its reasonable discretion within thirty (30) days of such casualty, then Owner shall have the option of terminating this Lease by written notice to Tenant designating a date upon which this Lease will terminate . . . .

(b) In all cases involving partial destruction or damage by fire, elements or any other cause, the extent to which the Premises are rendered untenantable shall be established by mutual agreement by Owner and Tenant acting reasonably.  Owner shall proceed to restore the improvements and reconstruct the same as closely as possible to their former state, Owner to bear the cost of the same out of the insurance proceeds.

(c) In the event that the improvements are damaged by fire or elements or any other cause, and Tenant is nevertheless able to continue in occupancy and use of the Premises in a manner substantially the same as they were used prior to said cause, Owner shall nevertheless proceed expeditiously with the repairs necessary to put the improvements in their former condition as nearly as possible.  If the work of repairing, replacing or rebuilding said damaged or destroyed improvement shall not be commenced within thirty (30) days from the date of insurance adjustment, or ninety (90) days from the date of damage, whichever shall first occur, and thereafter shall not be proceeded with expeditiously, Tenant shall have the right to cancel or terminate this Lease and the term hereof by giving to Owner not less than fifteen (15) days notice of intention to do so, it being agreed that upon the expiration of the time fixed in such notice if such work shall not have been commenced, and the other conditions hereof complied with, or if such work shall not have been proceeded with expeditiously, as the case may be, this Lease and term hereof shall, at the option of Tenant wholly cease

and expire except that all such insurance proceeds shall belong to Owner.

Docket No. 79-1, at 4-5.  This provision indicates that when improvements on the Premises are "partially or totally destroyed" by fire or elements or any other cause, the Owner shall make repairs from insurance proceeds, or in the event of total destruction, the Owner may terminate the lease.  *Id.* (emphasis added).

> *"Detroit Diesel had no duty to make repairs that would place the property in a better condition 'as when' it was 'delivered to it' at the beginning of the lease."  Docket No. 77, at 9.*

On this issue, the maintenance and repair clause speaks for itself:  DDR was only required to provide the maintenance and repairs that were necessary to "keep and maintain the Premises . . . in as good order and condition as when delivered to it."  Docket No. 79-1, at 2.

> *"Detroit Diesel had no duty . . . to 'rebuild' or to 'replace' items which have exceeded their useful life," Docket No. 77, at 10, or to "make structural or other permanent improvements,"  Docket No. 77, at 12.*

The Mississippi Supreme Court has stated that "[i]n determining the extent of the lessee's obligation under express covenants in relation to repairs, the courts will take into consideration his common-law liabilities."  *Avelez Hotel Corp.*, 87 So. 2d at 65.  Under the common law, a tenant has a duty "to care for the leased premises as to prevent injury to the inheritance, in order that the estate may revert to the lessor undeteriorated by the willful or negligent conduct of the tenant."  *Id.*  In other words, the covenant to repair obligates the lessee "to make such ordinary repairs as are necessary to prevent what would amount to waste."  *Id.*  Thus, *Avelez* suggests that under Mississippi law, in the absence of express language requiring extraordinary repairs, a covenant to repair requires a tenant to make only *ordinary* repairs.  It follows that unless there is specific language to the contrary, a covenant to maintain and repair does not require a tenant to

21

rebuild or replace a major structure after its useful life has been exceeded.  This interpretation of the DDR covenant to maintain and repair is supported by examining the lease as a whole, including the "Damage to Improvements" paragraph of the lease.  Under the damage to improvements paragraph, if the improvements on the Premises were partially or totally destroyed, Plaintiffs were responsible for beginning the process of "repairing, replacing or rebuilding said damaged or destroyed improvement . . . within thirty (30) days from the date of insurance adjustment, or ninety (90) days from the date of damage," or DDR had the right to cancel the lease.  Docket No. 79-1, at 5.  The parties' inclusion of the words "rebuilding" and "replacing" in the damage to improvements paragraph, when juxtaposed with the omission of those terms in the maintenance and repair paragraph, suggests that the parties did not intend for the tenants to be responsible for replacing or rebuilding major structures.

DDR also points to a Mississippi Supreme Court case, *Plaza Amusement Co. v. Rothenberg*, 131 So. 350, 357 (Miss. 1930),  to argue that a covenant to maintain and repair does not require a tenant to make structural repairs.  In that case, a commercial lease included the following language:  "It is agreed and understood that no repairs shall be made by the lessors, except to the roof, and that the lessee shall keep the said leased premises in good order and condition as received, during the term of the lease, and return the leased property at the expiration of the said lease to the lessors in like good order and condition, wear and tear excepted."  *Id.* at 351.  Under a supplemental contract, the lessor and lessee agreed that the subject property was to be used for theatrical purposes only.  *See id.* at 352.  However, the property's condition at the commencement of the lease made the property unsuitable for use as a theater according to state statutes and city ordinances, which, among other things, required the

addition of fire escapes to the building.  *Id.* at 352-54.  In discussing the lessee's right to put the property in a suitable condition for its intended use, the court stated, "It is said . . . that the lessees are not required to make repairs involving a structural change."  *Id.* at 357.  Although the case does not make completely clear whether the court adopted the rule that "lessees are not required to make repairs involving a structural change," the court went to great length to support its conclusions that the modifications necessary for the tenant to bring the building at issue into compliance with the law did not require structural change.  *See id.*; *see also id.* at 361 (Anderson, J., dissenting) (stating that a covenant to keep leased premises in repair "binds the lessee to make only ordinary repairs," and "does not require him to make repairs necessitating radical changes in the structure of a permanent, substantial, and unusual nature").

The court quoted a New York case in its discussion of what is considered a structural change:

> What is or amounts to a structural change is not easy of definition.  The term is elastic.  In a sense, a fire escape or stairway is a structure; so, also, is a stepladder, a post, or a fence.  By structural change, in cases of this character, I believe is meant such a change as to effect [sic] a vital and substantial portion of the premises, as would change its characteristic appearance, the fundamental purpose of its erection, or the uses contemplated, or a change of such a nature as would affect the very realty itself—extraordinary in scope and effect, or unusual in expenditure.  My impression is that the erection of a fire escape does not amount to a structural or extraordinary change, or come within that category.  Certainly it does not amount to a reconstruction of the building itself.  Nor does it involve unusual expense.

*Id.* at 357 (citation omitted).

The court also quotes a secondary source entitled *Repairs Required by Law or Public Authorities*:

> A covenant by the tenant to make necessary repairs includes repairs required by the public authorities, although it does not include a change in the condition of the

premises which is not technically a repair, nor an order to rebuild, but it may
require him to replace walls or parts thereof condemned by public authorities.

*Id.* at 356.

The context of *Plaza Amusement Co.* is notably distinguishable from the present case in
that *Plaza Amusement Co.* involves the determination of whether a lease should be declared void
when the leased property is, in its initial condition, unable to be used for the sole purpose
allowed under the lease, or whether, instead, the lessee is allowed to make the repairs necessary
to bring the leased property up to code so that it can be used for the purpose stated in the lease.
The case does, however, lend some support to the conclusion that a covenant to repair does not
require a tenant to make repairs requiring a structural change, which include repairs that are
"extraordinary in scope and effect, or unusual in expenditure." *Id.* at 357.  This conclusion is
stated similarly in *American Jurisprudence*:

> The word repair does not include alterations or additions.  It involves the idea of
> something preexisting, and presupposes something in existence to be repaired.
> Further, a covenant to repair implies preservation of the status quo and does not
> mean replacement.
> . . .
> A general covenant of the tenant to repair, or to keep the premises in repair,
> merely binds the tenant to make the ordinary repairs reasonably required to keep
> the premises in proper condition, and does not require the tenant to make repairs
> involving structural changes.

49 Am. Jur. 2d *Landlord and Tenant* § 705 (footnotes omitted).

Based on the foregoing, this Court concludes that the subject lease's maintenance and
repair provision did not require DDR to replace or rebuild improvements or to make repairs
involving structural changes, as defined in *Plaza Amusement Co. v. Rothenberg*, 131 So. at 357.[5]

---

[5] Note that this conclusion does not address the issue of what damages are now appropriate if a jury finds
that DDR violated the lease's maintenance and repair provision.  *See Brown v. Spitzer Chevrolet Co.*, 910 N.E.2d
490, 499 (Ohio Ct. App. 2009) ("We agree with [lessee] that the leases did not expressly impose a duty to replace or

However, the Court finds that DDR's assertion that it had "no duty . . . to 'rebuild' or to 'replace' items which have exceeded their useful life" is overly broad.  For example, a tenant's duty to maintain and repair may include a duty to replace items such as an inoperable door lock, a broken window, or a blown light bulb.  Thus, the interpretation of the scope of the maintenance and repair clause must be considered in context of the particular items that Plaintiffs claim to have been in disrepair at the conclusion of DDR's lease.

In 2010, Plaintiffs hired Peoples Construction Corporation to prepare an estimate for the damage for which they allege DDR is responsible.  *See* Docket No. 76-8.  Relying on *Wells v. Price*, 102 So. 3d 1250, 1258 (Miss. Ct. App. 2012),[6] in which the Court of Appeals of Mississippi states that "[t]he measure of damages for breach of contract and property damage can be either the reasonable cost of replacement or repairs, or diminution in value," Plaintiffs urge that DDR is liable for the total amount calculated in the Peoples' estimate.  DDR, however, argues that it is not responsible for any of the damages under the terms of the lease.

Regarding many of the categories of damages, DDR insists that the damage that existed at the conclusion of the lease is the result of ordinary wear and tear.  As discussed earlier, the "ordinary wear and tear" exception of the surrender clause did not relieve DDR of its duty to repair and maintain the Premises during the term of the lease.  However, it is understood that

---

restore.  Nonetheless, we find that [lessee] cannot claim it did not have a duty to replace or restore any or all of the property when, through its complete disregard of its express obligation to repair and maintain, the property has become so deteriorated that the only means of repairing is through replacement.").

[6] *See also Bell v. First Columbus Nat'l Bank*, 493 So. 2d 964, 970 (Miss. 1986) ("Plaintiff can choose to prove *either* reasonable cost of replacement or repairs *or* diminution in value, and if he proves either of these measures with reasonable certainty, damages are allowable, so long as the plaintiff will not be unjustly enriched and the defendant does not demonstrate that there is a more appropriate measure of damages.  In a setting where replacement of damaged or missing fixtures with new items is the only practicable means of restoring the facility to a valuable, marketable condition such reasonable replacement costs may be allowable as damages, even though the items replaced were other than brand new.").

even if DDR appropriately repaired and maintained the Premises during the term of the lease, some reasonable wear and tear would still exist at the time DDR surrendered the Premises.

DDR asserts that because Plaintiffs have not presented expert testimony to counter DDR's expert testimony that certain damage to the Premises is merely the result of ordinary wear and tear, it is entitled to summary judgment.  However, Plaintiffs' lack of expert testimony is not a basis for summary judgment in favor of DDR.  A jury may consider testimony of Plaintiffs' fact witnesses and other evidence to determine whether damage to the Premises is the result of ordinary wear and tear.  *See, e.g.*, *Waggaman v. Forstmann*, 217 A.2d 310, 311-12 (D.C. 1966) (concluding, in case for alleged damages to a furnished apartment, that the trial court did not err "in refusing to permit three witnesses, whom [landlords] proffered as experts, to state their conclusions relating to wear and tear for guidance of the jury," where the court allowed the witnesses "to give direct testimony respecting the condition of the apartment and its contents as viewed by them after the lease had terminated"); *Pittman v. Great Atlantic & Pacific Tea Co.*, No. 07-3074, 2008 WL 8833262, at *1 (E.D. La. Aug. 21, 2008) (declining to allow lessee's employee to give an expert opinion regarding whether the lessee surrendered leased premises "in good order and condition, reasonable wear and tear excepted,"[7] while stating that the employee could "[u]pon the establishment of a proper foundation, . . . provide relevant fact testimony and . . . testify regarding industry customs and practices pertinent to the issues").  Further, the jury is at liberty to accept or reject DDR's expert testimony on the issue.  Even though DDR's experts have opined that certain damages were the result of ordinary wear and

---

[7] *See Pittman v. Great Atlantic & Pacific Tea Co.*, No. 2:07-cv-3074-KDE-JCW (E.D. La.), Docket No. 1-1 (Complaint), at 2; *id.*, Docket No. 48-1 (Plaintiffs' Memorandum in Support of Motion *in Limine*), at 1.

tear, their testimony only presents a genuine dispute of fact regarding whether DDR satisfied its

duty to maintain and repair, and if not, what damages are attributable to DDR as a result of its

failure to maintain and repair.  *See Hinkson v. Great Atlantic & Pacific Tea Co.*, 3 A.2d 197, 199

(Pa. Super. Ct. 1938) ("The only issue involved was whether [lessee] surrendered the premises at

the expiration of the term 'in as good state and condition as received, reasonable wear and tear

and damages by fire or the elements, or from other causes beyond its control, excepted.'  This

was clearly a question of fact for the jury.").

Having established the foregoing, as to each repair item included in the Peoples'

estimate, the Court shall consider whether DDR's or Plaintiffs' motion for summary judgment

should be granted.

i. Concrete/Site Work

The lease required DDR to maintain and repair the Premises throughout the term of the

lease, with "Premises" being defined as the land and "all buildings, structures and improvements

thereon."  Docket No. 79-1, at 11.  Based on the broad definition of "Premises," DDR had a duty

to maintain and repair the concrete on the property during the term of the lease.  *See South Road*

*Assocs., LLC v. Int'l Bus. Machines Corp.*, 826 N.E.2d 806, 807-09 (N.Y. 2005) (looking at

lease's definition of "premises" for purposes of determining whether lessee had duty to maintain

certain parts of the leased property); *Platt v. City of Philadelphia*, 133 A.2d 860, 861, 864-65

(Pa. Super. Ct. 1957) (holding that lessee that was required to make all repairs except roof

repairs and structural repairs was liable for the cost of restoring the concrete footway, driveway,

and guardrail of the leased premises, each of which was in good order and repair when the lease

began).

DDR argues that "Plaintiffs may not recover for the permanent improvement or 'replacement' of a substantial portion of the paved area on the premises that was damaged through no fault of the lessees."  Docket No. 77, at 22.  However, DDR may be responsible for at least a percentage of the reasonable cost of replacing portions of the paved area if a jury finds that DDR failed to properly maintain and repair the paved area during the term of the lease.  *See Wells*, 102 So. 3d at 1258; *Bell v. First Columbus Nat'l Bank*, 493 So. 2d 964, 970 (Miss. 1986).  Further, DDR's duty to maintain and repair the Premises arose regardless of whether it was at fault for damage that occurred during the lease's term.

Relying on expert testimony, DDR also argues that damage to the paved areas was the result of improper design and construction.  DDR's evidence regarding the design and construction of the paved areas may be relevant to the question of what condition the paved areas should have been in at the conclusion of the lease even if there were proper maintenance and repair, but it is not a basis for a conclusion on summary judgment that DDR is not responsible for any damages relating to the condition of the paved areas when the lease concluded.  Rather, DDR's evidence presents a genuine dispute of fact as to the appropriate damages.

DDR also presents evidence from its experts that damage to the concrete is the result of ordinary wear and tear of operating a heavy engine repair shop.  A jury must decide whether it agrees with that assessment.

### ii. Roof Replacement

DDR has not presented any evidence that repairing the buildings' roofs involved "structural changes."  *See Plaza Amusement Co.*, 131 So. at 357 (defining "structural change" as "change as to [a]ffect a vital and substantial portion of the premises, as would change its

28

characteristic appearance, the fundamental purpose of its erection, or the uses contemplated, or a change of such a nature as would affect the very realty itself—extraordinary in scope and effect, or unusual in expenditure").  Thus, the lease required DDR to repair and maintain the buildings' roofs in order to keep them in the same condition that they were in when DDR took possession of the Premises.  However, the lease did not require DDR to replace the roofs when repairs and maintenance could no longer address the roofs' problems.  The plain meaning of "maintain and repair" does not include replacing a major structure such as a roof.  *See Mach v. Accettola*, 678 N.E.2d 617, 620 (Ohio Ct. App. 1996) ("We read the lease language . . . as requiring [lessees] to make ordinary repairs, but we do not construe 'repair' or 'maintenance' to mean replacement of the roof which was completely worn out.").  That DDR's duty to repair and maintain the roofs did not include a duty to replace the roofs does not, however, foreclose the possibility that if Plaintiffs are able to prove that DDR breached the covenant to maintain and repair, DDR may be responsible for at least a portion of the cost of replacing the roofs.

The record includes both evidence that at least one roof had deteriorated beyond repair and needed replacement, which was Plaintiffs' duty, as well as evidence that the roof only needed to be repaired, which was DDR's duty.[8]  *See* Docket No. 87-2 (Dearman Dep.), at 70-71; Docket No. 53-1 (Dearman Report), at 8; Docket No. 76-2 (Harrell Jeanes, Jr. Dep.), at 4-5. Furthermore, there is conflicting evidence regarding the useful life of the type of roof used on the buildings.  The evidence presents a genuine dispute of material facts regarding whether DDR

---

[8] Plaintiffs have also testified that they hired professionals to make repairs to the roof.  While Plaintiffs assert that they were simply providing a courtesy to DDR as good will, DDR argues that Plaintiffs had taken on the duty of repairing the roof.  Although this testimony may ultimately provide DDR a viable defense relating to roof damage, the Court does not consider such parol evidence in determining the meaning of the contracts' terms.  The Court does not find the contract to be ambiguous with regards to DDR's duty to maintain and repair the roof since those repairs were not explicitly excluded from DDR's duty to maintain and repair.

breached its duty to maintain and repair the roof, and if so, what damages are appropriate for that breach.  Consequently, summary judgment is inappropriate as to liability and damages relating to the roofs.

iii. Restore Office Areas

DDR asserts that Plaintiffs have failed to identify what damage is being addressed through the restoration of the office area, with the exception of possibly water damage, which DDR alleges is the result of Plaintiffs' failure to replace the roof, and expenses for bringing the HVAC, mechanical, and electrical systems "up-to-code."  Docket No. 77, at 22-23.  Consequently, DDR argues that it is entitled to summary judgment with regards to Plaintiffs' claims for damages for restoring the office areas.

Because DDR's duty to maintain and repair does not require it to place the Premises in a better condition than it was at the commencement of the lease, DDR was not required to make the HVAC, mechanical, and electrical systems compliant with new codes and regulations.  The lease does not include language that suggests that those types of expenses were contemplated by the parties at the time the lease was executed.  However, given the broad definition of "Premises," DDR was obligated to maintain and repair the HVAC, mechanical, and electrical systems, in addition to the office areas in general.

A factual issue exists regarding whether DDR breached its duty to repair the roof during the term of the lease, and as such, a factual dispute also exists regarding whether DDR is liable for water damage that occurred in the office area as a result of leaks from the roof.  Thus, the Court cannot determine that, as a matter of law, DDR is not liable, at least in part, for the cost of restoring the office area.  Furthermore, although DDR asserts that Plaintiffs have not identified

30

the particular damage that would be addressed in the cost for restoring the office areas, the Plaintiffs have submitted photographs of damage to the office area, and the expert report of Clarke's expert, William Ware, indicates that restoration of the office areas involves "demolition and removal of existing office areas in both buildings, including walls, doors, ceilings, flooring, plumbing, HVAC, lighting, etc.," and reconstruction of the office area.  Docket No. 76-10, at 5-6.  It is the jury's duty to determine whether the office area was in good condition when the lease terminated and whether DDR is liable for any part of the cost of restoring the office areas.

### iv. Restore Front of Building

In support of its argument for summary judgment in its favor on the issue of damages for restoring the front of the main building, DDR states, "Plaintiffs have not demonstrated what damage, if any, is being addressed via the proposal to merely 'restore' the front of the building. As such, the repair covenant does not appear to be invoked. Also of note, Detroit Diesel could not possibly have a duty to repair the front of the building damaged by a storm in 2012 after the lease was terminated."  Docket No. 77, at 23.  Plaintiffs did not respond by identifying the basis of its allegation that DDR is responsible for restoring the building front or by providing evidence that any damage to the front of the building that required restoration occurred before DDR's lease expired.  *See* Docket No. 105.  As such, summary judgment shall be granted in favor of DDR as to Plaintiffs' claims for damages relating to restoring the building front.[9]

---

[9] To the extent Plaintiffs assert that DDR must pay to "undo" changes to the front of the building made during Clarke's remodeling, for which Plaintiffs gave their permission, *see* Docket No. 95-2, at 2, the exception to the surrender clause bars Plaintiffs from seeking such damages.  *See* Docket No. 79-1, at 6 ("Tenant shall . . . surrender the Premises in good condition and repair except for . . . (ii) damage resulting from . . . alterations . . . agreed to by Owner.").

v. Replace Wall Panels

DDR argues that it is not liable for replacing wall panels because its expert testified that any damage to the wall panels is ordinary wear and tear, and that "the areas where these damages were located such as the truck repair shop and the outbuilding were still fully functional." Docket No. 77, at 23.  However, determining whether the areas were "fully functional" does not adequately answer the relevant inquiry of whether the areas were, at the end of the lease, in good condition, ordinary wear and tear excepted.  Further, DDR's "wear and tear" defense does not provide a basis for summary judgment, but only presents questions of fact as to whether DDR is liable for the deteriorated condition of the walls, and what damages, if any, are appropriate.

vi. Paint Exterior

Relying on its experts' conclusions, DDR asserts that "any deterioration of the paint on the exterior of the building is due to ordinary wear and tear and the fact [that] the paint had exceeded its useful life" of 15 to 20 years.  Docket No. 77, at 23.  DDR's duty to maintain and repair the Premises required it to paint the buildings' exterior as often as a reasonably prudent owner would.  *See Nadler*, 764 F.2d at 416 (applying, under Texas law, "reasonably prudent owner" standard to lessee's duties to repair and replace); *see also Connell v. Brownstein-Louis Co.*, 261 P. 331, 333 (Cal. Dist. Ct. App. 1927) ("A tenant who sits by for 10 years and allows the metal parts of the building to decay for lack of a renewal coat of paint is not using ordinary care for its preservation.  The exception of ordinary wear and tear contemplates that deterioration will occur by reason of time and use in spite of ordinary care for its preservation.").  Therefore, that the paint had exceeded its useful life does not support DDR's defense.  Additionally, summary judgment is inappropriate because DDR's "wear and tear" defense presents an issue of

32

fact that must be resolved by the jury.

> b. Indemnity

> Plaintiffs assert that DDR was obligated under paragraph 8 of the lease to

> indemnify and hold owner harmless from and against all losses, costs, damages,
> expenses, and liability, including but not limited to reasonable attorney fees,
> which owner may incur or pay out by reason of (a) any injury to persons or
> property occurring in, on or about the Premises, even though such might have
> been caused or contributed to by the negligence of Owner; (b) any breach or
> default hereunder on Tenant's part; (c) any work done in or to the Premises; (d)
> any maintenance or repair work performed by or required to be performed by
> Tenant hereunder; or (e) any act or negligence on the part of Tenant; provided,
> however, to the extent of the proceeds received by Owner under any insurance
> furnished by Tenant, Tenant's obligation to indemnify and hold harmless Owner
> against the claim covered by such insurance shall be deemed to be satisfied to
> such extent.

Docket No. 79-1, at 3.  DDR, however, argues that under the facts of this case, Plaintiffs are not

entitled to damages from DDR based on the indemnity clause.  The Court agrees with DDR's

interpretation.  The first sentence of the "Accidents, Indemnity and Public Liability Insurance"

paragraph provides the context for the indemnity provision.  The indemnity provision applies

when there is "damage to person or property sustained by Tenant or others caused by any non-

repair of the Premises required of Tenant" under the lease.  *Id.*  In such cases, DDR would be

required to indemnify Plaintiffs "against all losses, costs, damages, expenses and liability,"

using, when available, the proceeds of the public liability insurance that it was required to

procure under the terms of the policy and for which both DDR and Plaintiffs should have been

named as insureds.  *See id.*  This case does not, however, present such a scenario, because the

basis of this action is alleged damage to Plaintiffs' property, not damage to DDR or others, or to

the property of DDR or others.

33

**B. DDR-Clarke Sublease**

Clarke moves for summary judgment in its favor as to DDR's third-party complaint against it, arguing that "Clarke complied with its duties under . . . its sublease with Detroit Diesel to surrender the property in good condition and repair, with the exception of ordinary wear and tear," and that it "has absolutely no duty under the sublease to make the large scale renovations and replacements to the facility and real property that Plaintiffs seek in this litigation." Docket No. 82, at 2. The relevant portion of the maintenance and repair provision in the sublease states as follows:

> Maintenance and Repair. Subtenant acknowledges that it is accepting the Premises in its present "as is" condition and that Landlord shall have no obligations to make any repairs, renovations or improvements to the Premises except for the renovations and improvements identified in Exhibit B. Subtenant shall perform at its sole cost and expense all repair work necessary on the premises in order to use the Premises for the operation of Subtenant's business therein. Subtenant shall keep and maintain the Premises in a clean, sanitary and safe condition, free from and clear of rubbish, dirt, snow and ice, in good order and repair. In addition, Subtenant shall keep and maintain all areas outside the building on the Premises, including but not limited to sidewalks, curbs, roadways, parking areas and fences, and any equipment, fixtures, motors or machinery thereon or thereof, in clean, sanitary and safe condition, free from and clear of rubbish, dirt, snow and ice, in good order and repair. Subtenant shall not make or cause to be made any structural alterations, renovations or improvements to the Premises without Landlord's prior written consent.

Docket No. 7-1, at 2. The sublease notes that the term "Premises" is defined in the prime lease. *See id.* at 1. Additionally, the sublease's surrender provision is substantially similar to the prime lease's surrender provision:

> Upon expiration of the term of this Sublease, Subtenant shall promptly and peaceably surrender the Premises in good condition and repair except for (a) ordinary wear and tear, and (b) damage resulting from fire and other casualty, acts of God or other causes not insured against by Landlord or Subtenant, or alterations or additions agreed to by Landlord.

*Id.* at 6.

Clarke erroneously argues that its repair obligations were narrower than DDR's repair obligations, and that Clarke was only required to perform "repair work necessary on the premises in order to use the Premises for the operation of [Clarke's] business therein."  Docket No. 108, at 2 (quoting sublease).  Clarke ignores additional language of the maintenance and repair provision that, similar to the prime lease's language, requires Clarke to "keep and maintain the Premises in a clean, sanitary and safe condition, free from and clear of rubbish, dirt, snow and ice, in good order and repair."  Docket No. 7-1, at 2.  The Court, therefore, finds that the maintenance and repair and surrender provisions of the sublease are unambiguous and that Clarke's obligations under the provisions are the same as DDR's obligations under the prime lease.  Clarke was obligated to maintain and repair all of the Premises, but it was not required to make any structural alterations.  If Clarke failed to properly repair and maintain the Premises, it may be liable for all or some of the cost of repairing the property's concrete areas, replacing the roofs, restoring the office areas, replacing wall panels, and painting the buildings' exterior.

Although Clarke argues that its proof that it surrendered the property in good condition and repair except for ordinary wear and tear is unrebutted, as explained earlier with regard to the prime lease, Plaintiffs' evidence is sufficient to raise a genuine dispute of fact regarding whether the property was surrendered in good condition, ordinary wear and tear excepted.  To the extent the jury finds that the property was surrendered in subpar condition, the jury must also determine what portion of the damages, if any, is attributable to Clarke.

### IV. CONCLUSION

For the foregoing reasons, DDR's motion for summary judgment, Docket No. 76, is

granted in part and denied in part; Plaintiffs' motion for summary judgment, Docket No. 79, is

denied; and Clarke's motion for summary judgment, Docket No. 81, is denied.

      **SO ORDERED**, this the 6th day of May, 2014.

                                        s/ Carlton W. Reeves

                                   UNITED STATES DISTRICT JUDGE